UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DYLAN HARRIGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-10132-JCB |
| ) | |
| NEW ENGLAND DRAGWAY, INC. ) | |
| ) | |
| Defendant, ) | |
| ) | |
| v. ) | |
| ) | |
| RALPH T. HARRIGAN and JUDY A. ) | |
| HARRIGAN, ) | |
| ) | |
| Third-Party Defendants. ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DEFENDANT'S MOTION TO STRIKE, AND PLAINTIFF'S MOTION TO STRIKE**
[Docket Nos. 21, 42, 45]

January 2, 2014

Boal, M.J.

This action arises from a motorcycle accident involving the plaintiff, Dylan Harrigan ("Dylan"), at a motocross track owned and operated by defendant New England Dragway, Inc. ("Dragway"). Dylan alleges that Dragway's negligence, gross negligence, and/or reckless, willful and wanton conduct caused the accident and his resulting injuries. Docket No. 19. Dragway has filed a motion for summary judgment on all counts. Docket No. 21. Dragway has also filed a motion to strike portions of the evidence submitted by Dylan in opposition to the summary judgment motion. Docket No. 42. In turn, Dylan has filed a motion to strike evidence submitted by Dragway in support of its summary judgment motion. Docket No. 45. For the

following reasons, the Court denies Dragway's motion for summary judgment and grants the motions to strike.[1]

I.      FACTUAL BACKGROUND[2]

   A.      The Parties And The Accident

Dylan is an individual who resides in South Hamilton, Massachusetts. Dittmar Aff. Ex. B at 2; AC ¶ 2.[3] Dragway is a New Hampshire for-profit corporation with a principal place of business in Epping, New Hampshire. PSMF ¶ 1; AC ¶ 3.

On September 26, 2009, Dylan, then fifteen years old, was injured while operating his motorcycle on a motocross track owned and operated by Dragway. DSMF ¶¶ 1, 3. The parties dispute the cause of the injury. Dragway states that the incident occurred when Dylan lost control of his bike during a jump. DSMF ¶ 2. Dylan states that he lost control while trying to avoid a pile of roots and rocks located at the top of the jump. Id.; PSMF ¶ 17. Dylan states that the next rider also lost control of his bike and landed on him. PSMF ¶ 17.[4]

---

[1] On April 24, 2013, the parties consented to jurisdiction by a United States Magistrate Judge for all purposes. Docket No. 11.

[2] Because this case is before the Court on a motion for summary judgment, the Court sets out any disputed facts in the light most favorable to the non-moving party. See DeNolvellis v. Shalala, 124 F.3d 298, 302 (1st Cir. 1997). The facts, unless otherwise noted, are undisputed and are derived from: (1) Dragway's statement of material facts and Dylan's response thereto ("DSMF_") (Docket No. 27); and (2) Dylan's statement of additional material facts and Dragway's response thereto ("PSMF _") (Docket No. 44).

[3] "Dittmar Aff. _" refers to the affidavit of Chris Dittmar in support of Dragway's motion. Docket No. 24. "AC _" refers to Dylan's amended complaint. Docket No. 19.

[4] Arguing that the statement is inadmissible, Dragway has filed a motion to strike this statement and other portions of the evidence submitted by Dylan in opposition to Dragway's summary judgment motion. Docket No. 42. As discussed infra, to the extent that any of this evidence is inadmissible, the Court has not considered such portions in reaching its decision. See Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc., No. 10-10742, 2011 WL 6812642, at *7 n. 1 (D. Mass. Dec. 28, 2011).

B.  The Waiver Agreements

Prior to the accident, on September 16, 2009, Dylan's parents executed a "Minor Release And Waiver Of Liability And Indemnity Agreement" on behalf of themselves and Dylan (the "Minor Release Agreement").  DSMF ¶ 11; Dittmar Aff. Ex. B.  The Minor Release Agreement applied to the "New England Dragway/MX 101" for "All Events - 2009 Race Season."  Dittmar Aff. Ex. B.  The Minor Release Agreement includes an assumption of risk provision, which states:

> THE MINOR AND PARENT OR GUARDIAN HEREBY ASSUME FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH, OR PROPERTY DAMAGE due to the negligence of Releasees [] or otherwise, while in or upon the RESTRICTED AREA for any purpose and/or while participating in any way in the Event.  The undersigned recognize and understand that there are risks and dangers associated with participation in the Event and admission within the RESTRICTED AREA that could cause severe bodily injury, disability and death.  Further, the risks and dangers may be caused by the negligent failure to act of the Releasees and others.  All of the risks and dangers associated with participating in the Event and/or entry into the RESTRICTED AREA are assumed notwithstanding.

Id. at ¶ 2.  The Minor Release Agreement defines "RESTRICTED AREA" as "any area requiring special authorization, credentials or permission to enter or any area to which admission by the general public is restricted or prohibited, including but not limited to the competition area and any hot pit or paddock area."  Dittmar Aff. Ex. B.  The agreement also contains an exculpatory provision that provides:

> THE MINOR AND PARENT OR GUARDIAN release, waive discharge and covenant not to sue . . . [the Releasees], from all liability to ourselves . . . for any and all claims, demands, losses or damages of the MINOR and/or parent or guardian on account of any injury, including but not limited to the death or injury of the parent/guardian or MINOR . . . all of which is caused or alleged to be caused by the negligence of the Releasees or otherwise.

Id. at ¶ 3.  The Minor Release Agreement defines "Releasees" to include, among others, "track operators" and "track owners" and extends "to all acts of negligence by the Releasees . . . and

3

[is] intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted . . ." Id. at ¶¶ 3, 5.  Each signature line on the Minor Release Agreement contains the language "I HAVE READ THIS RELEASE."  Dittmar Aff. Ex. B.

On September 26, 2009, upon their arrival at Dragway, Dylan and his father Ralph "Tim"[5] Harrigan ("Ralph") signed a "Release and Waiver of Liability, Assumption of Risk And Indemnity Agreement" (the "Participation Release Agreement").  DSMF ¶ 17; Dittmar Aff. Ex. C.  This agreement applies to Dylan and Ralph's participation in the September 26, 2009 event at MX101.  Dittmar Aff. Ex. C.  The Participation Release Agreement contains provisions similar to those in the Minor Release Agreement, by which Dylan and Ralph each assumed the risk of participation in the event and waived all claims against the "Releasees."  See id. at ¶¶ 2, 4.  As with the Minor Release Agreement, the Participation Release Agreement defines "Releasees" to include "track operators" and "track owners."  Id. at ¶ 2.  Each signature line on the Participation Release Agreement contained the language "I HAVE READ THIS RELEASE."  Dittmar Aff. Ex. C.

## II.     PROCEDURAL HISTORY

On October 1, 2012, Dylan filed a complaint in state court asserting negligence claims against Dragway and American Suzuki Motor Corporation ("Suzuki"), the alleged manufacturer of Dylan's motorcycle.  Docket No. 1 ¶ 1 & Ex. A at 3-4.  On January 22, 2013, Dragway removed the case to this Court on the basis of diversity jurisdiction and answered the complaint.  Docket No. 1 at ¶ 4; Docket No. 3.[6]

---

[5] Ralph apparently goes by "Tim" and signed the Participation Release Agreement as Tim Harrigan.

[6] Dragway also filed a third-party complaint against Ralph and Judith Harrigan (Dylan's mother) seeking indemnification pursuant to the Minor Release Agreement.  Docket No. 5.

Dylan filed an amended complaint on June 7, 2013. Docket No. 19. The amended complaint dismisses Suzuki as a defendant in this case and asserts new claims against Dragway for gross negligence and reckless, willful or wanton conduct. Id.

On August 14, 2013, Dragway filed its summary judgment motion. Docket No. 21. Dylan opposed Dragway's motion on September 25, 2013. Docket Nos. 25-26. On October 8, 2013, Dragway filed a reply brief, as well as its motion to strike. Docket Nos. 42-43. Dylan filed his motion to strike on October 21, 2013. Docket No. 45. The Court heard oral argument on October 23, 2013.

### III. STANDARD OF REVIEW

#### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts

---

Ralph and Judith Harrigan answered the third-party complaint on March 20, 2013. Docket No. 8.

showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

"[T]he material creating the factual dispute must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth. Optimistic conjecture . . . or hopeful surmise will not suffice." Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 338 (1st Cir. 1997).

The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

B. Scope Of The Record

Dragway has filed a motion to strike from the record certain evidence submitted by Dylan in opposition to Dragway's summary judgment motion. Docket No. 42. Specifically, Dragway moves to strike: (1) Ralph's affidavit (Docket No 28-1); (2) paragraphs 3, 6-8, 10, 11, and 14 of Dylan's affidavit (Docket No. 30); and (3) paragraphs 3, 6-8, 10, 11, and 14 of Pete Sullivan's affidavit (Docket No. 31). Id. at 2. Dragway argues that this evidence contradicts earlier deposition testimony and fails to comply with Fed. R. Civ. P. 56(c)(4).[7]

---

[7] Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In turn, Dylan has moved to strike the supplemental affidavit of Chris Dittmar (Docket No. 41) in support of Dragway's summary judgment motion. Docket No. 45. Dylan argues that the affidavit is incorrect and misleading. Docket No. 46 at 2.

The contested portions, however, concern the merits of the case, i.e. whether Dragway's alleged negligence or gross negligence caused Dylan's injuries. Because the instant decision rests solely on the enforceability of the subject release agreements and does not reach the underlying merits of the case, the Court does not take into consideration such evidence for purposes of this decision. Accordingly, the Court grants the parties' motions to strike.

IV.  ANALYSIS

Dragway has moved for summary judgment on the grounds that the Minor Release Agreement and Participation Release Agreement preclude Dylan's claims. Docket No. 23 at 2-5. To the extent that Dylan has amended his complaint to add gross negligence solely to avoid the applicability of those agreements, Dragway also argues that no genuine issue of material fact exists as to Dylan's gross negligence claim. Id. at 5-7. Dylan responds that the liability releases are legally void and do not cover the accident at issue or the claims asserted in the amended complaint. Docket No. 26 at 4-14.

A.  Applicable Law

As an initial matter, the parties appear to dispute whether the substantive law of Massachusetts or New Hampshire governs Dylan's claims. Dragway cites only to Massachusetts law in support of its summary judgment motion. See Docket No. 23. Dylan relies on case law from both jurisdictions but acknowledges that a conflict exists. Docket No. 26 at 3.[8]

---

[8] Notably, Massachusetts law and New Hampshire law diverge with respect to the enforceability of release provisions. Compare Barnes v. New Hampshire Karting Ass'n, 128 N.H. 102, 106-107 (1986) (New Hampshire generally prohibits exculpatory contracts, including liability releases, and construes such contracts strictly against the defendant) with Sharon v. City

A federal court sitting in diversity applies the choice-of-law framework of the forum state.  Hansen v. Rhode Island's Only 24 Hour Truck & Auto Plaza, Inc., No. 12-10477-NMG, 2013 WL 2491054, *3 (D. Mass.  June 7, 2013) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  Massachusetts eschews any particular choice-of-law doctrine and instead employs a "functional approach" to choice of law.  Tidemark Bank for Savings v. Morris, No. 94-1598, 1995 WL 368418 (1st Cir. June 19, 1995) (citing Cosme v. Whitin Mach. Works, Inc., 632 N.E. 2d 832, 834 (Mass. 1994)).  This functional approach is "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)."  Levin v. Dalva Bros., Inc., 459 F.3d 68, 74 (1st Cir. 2006) (quoting Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass. App. Ct. 492 (2004));  Geshke v. Crocs, Inc., 889 F. Supp. 2d 253, 260 (D. Mass. 2012).

The choice of law analysis for tort cases is set forth in Section 145 of the Restatement.  Section 145 of the Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Restatement (Second) of Conflict of Laws § 145(1) (1971) (emphasis added).  Those contacts include:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971).

Here, relevant contacts under Section 145 are in both Massachusetts and New Hampshire.  Both the conduct causing Dylan's injury and the injury itself occurred at Dragway's MX101

---

of Newton, 437 Mass. 99, 105, 108-09 (2002) (Massachusetts law favors the enforcement of liability releases).

track in New Hampshire.  DSMF ¶ 1.  Dragway is a New Hampshire corporation with a principal place of business in New Hampshire.  PSMF ¶ 1; AC ¶ 3.  The relationship between the parties is centered on Dylan's participation in motocross activities at Dragway's MX101 track.  See DSMF ¶ 6.  The Harrigans are Massachusetts residents.

The relevant contacts weigh in favor of the application of New Hampshire law.  Not only is New Hampshire the place where the injury occurred, but New Hampshire is the place where the pertinent relationship between the parties occurred for purposes of Dylan's tort claims.  Even if the Court were to consider the policy considerations set forth in Section 6(2) of the Restatement (Second) of Conflict of Laws, those factors would still weigh in favor of the application of New Hampshire law.   While each state has an interest in protecting the interests of its citizens, New Hampshire is the place where the Defendant is located and the place of injury.

Accordingly, the Court finds that New Hampshire law applies to Dylan's tort claims.[9]

      B.      <u>The Release Agreements</u>

            1.      *The Participation Release Agreement*

Dragway argues that the Participation Release Agreement precludes Dylan's claims.  See Docket No. 23 at 3-4; Docket No. 43 at 2.  Dylan responds that he signed the agreement as a minor and may now repudiate it.  See Docket No. 26 at 4.

---

[9] At oral argument, Dragway argued that the Court should apply contract choice-of-law principles to the scope of the release agreements and find that the Minor Release Agreement, which was signed in Massachusetts, is governed by Massachusetts law.  The Court disagrees.  In determining whether to apply tort or contract choice-of-law principles, the Court must look to the nature of the claim.  See <u>Daynard v. MRRM, P.A.</u>, 335 F. Supp. 2d 156, 160-63 (D. Mass. 2004).  Here, Dylan asserts only tort claims.  Docket No. 19.  Dragway's arguments based on the release agreements are asserted as an affirmative defense to those claims.

In New Hampshire, a minor who enters into an agreement may repudiate that agreement at any time before reaching majority or within a reasonable time thereafter. State v. Benoit, 126 N.H. 6, 11 (1985); Porter v. Wilson, 209 A.2d 730, 732 (N.H. 1965); Wooldridge v. Lavoie, 104 A. 346, 347 (N.H. 1918). The party may effectuate repudiation by filing suit to disavow the agreement. See Stack v. Cavanaugh, 30 A. 350, 351 (N.H. 1892).

Here, Dylan was fifteen years old at the time he signed the Participation Release Agreement. DSMF ¶ 3. He filed this action on October 1, 2012, only a few months after reaching majority. Docket No. 1 ¶ 1; Dittmar Aff. Ex. B at 2. Dragway does not argue that Dylan was unreasonably tardy in filing this suit or that he has not adequately repudiated the agreement. See Docket No. 23 at 4-5. Indeed, at oral argument, Dragway conceded that Dylan had repudiated the Participation Release Agreement by filing this action.

The Court finds that Dylan has repudiated the Participation Release Agreement and, therefore, Dylan's claims are not barred by that agreement. Accordingly, the Court denies Dragway's motion for summary judgment based on that agreement.

2. *The Minor Release Agreement*

Dragway argues that the Minor Release Agreement precludes Dylan's claims. Docket No. 23 at 3-5; Docket No. 43 at 2-3. Dylan counters that the Minor Release Agreement is void as contrary to public policy because, among other reasons, such releases are not valid against for-profit entities. See Docket No. 26 at 4-7.

New Hampshire generally prohibits exculpatory contracts, including liability releases. See Barnes, 128 N.H. at 106-107. A defendant seeking to avoid liability must show, inter alia, that the agreement does not violate public policy. Id.; Dean v. MacDonald, 147 N.H. 263, 266-67 (2001). An agreement is against public policy if, among other things, it is "injurious to the

interests of the public, violates some public statute, or tends to interfere with the public welfare or safety." McGrath v. SNH Development, Inc., 158 N.H. 540, 543 (2009) (citing Harper v. Healthsource New Hampshire, 140 N.H. 770, 775 (1996)). Releases are strictly construed against the defendant. Audley v. Melton, 138 N.H. 416, 418 (1994).

Under this analysis, courts have validated prospective exculpatory agreements between an adult and a commercial entity. See, e.g., McGrath, 158 N.H. at 544-45 (snowboarder's pre-injury release agreement with ski resort did not violate public policy); Dean, 147 N.H. at 270 (race car worker's pre-injury agreement with speedway and racing association precluded negligence claim). There is, however, no controlling authority on the precise question of whether a parent may bind a minor child to such prospective exculpatory agreements.

In the absence of controlling authority, this Court "must predict the New Hampshire Supreme Court's future course on this issue." Smith v. Stilphen, 344 F. Supp. 2d 794 (D.N.H. 2004) (citing FDIC v. Ogden Corp., 202 F.3d 454, 460-61 (1st Cir. 2000)). This task requires "'an informed prophecy of what the [New Hampshire Supreme Court] would do in the same situation,' seeking 'guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law.'" Walton v. Nalco Chem. Co., 272 F.3d 13, 20 (1st Cir. 2001) (quoting Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996)). It also demands "considerable caution" and respect for the "well-marked boundaries" of New Hampshire law. Doyle v. Hasbro, 103 F.3d 186, 192 (1st Cir. 1996) (quoting Andrade v. Jamestown Housing Authority, 82 F.3d 1179, 1187 (1st Cir. 1996)).

The vast majority of analogous state court decisions have held that agreements such as the Minor Release Agreement are unenforceable against a minor because they are contrary to

public policy.  Galloway v. State of Iowa, 790 N.W.2d 252, 258 (Iowa 2010) (public policy precludes enforcement of a parent's pre-injury waiver of child's personal injury claim); Kirton v. Fields, 997 So.2d 349, 350 (Fla. 2008) (holding that a parent lacks authority to execute, on behalf of minor child, pre-injury release in favor of a commercial motor sports park "when the release involves participation in a commercial activity"); Hojnowski v. Vans Skate Park, 187 N.J. 323, 327 (2006) (finding that where a child was injured while skateboarding at a skate park facility, "a parent may not bind a minor child to a pre-injury release of a minor's prospective tort claims resulting from the minor's use of a commercial recreational facility").  Federal courts, applying state law, have followed suit.  See J.T. ex rel. Thode v. Monster Mountain, LLC, 754 F. Supp. 2d 1323, 1328 (M.D. Ala. 2010) (denying summary judgment on basis that Alabama law would not allow a parent via a coach to bind a child to a pre-injury liability waiver in favor of a for-profit motocross activity); Paz v. Life Time Fitness, Inc., 757 F. Supp. 2d 658, 663 (S.D. Tex. 2010) (denying summary judgment based on release because under Texas law a pre-injury release of a commercial enterprise executed by a parent in not enforceable).

Although a minority of states have upheld a parent's pre-injury exculpatory agreement on behalf of a minor child, they have done so primarily on the basis that the defendant is a government or non-profit sponsor of the activity.  Sharon v. City of Newton, 437 Mass. 99, 108-09 (2002) (validating release agreement in favor of municipality that was signed by father, on behalf of daughter, for daughter's participation in extracurricular sports); Hohe v. San Diego Unified Sch. Dist., 224 Cal. App. 3d 1559, 1564-65 (1990) (finding a pre-injury release executed by a father on behalf of his minor child enforceable against any claims resulting from the child's participation in a school-sponsored event); Zivich v. Mentor Soccer Club, Inc., 82 Ohio St. 3d

367, 374 (1998) (parents' pre-injury release for their minor children upheld because the threat of liability would strongly deter "many individuals from volunteering for nonprofit organizations").

The majority-view holdings are based on several common considerations. Several of the majority-view decisions are based on the state's duty to act as parens patriae. "Parens patriae refers to the "state in its capacity as provider to those unable to care for themselves." Hojnowski, 198 N.J. at 333 (quoting Black's Law Dictionary 1144 (8th ed. 2004)). Specifically, "[a]lthough parents undoubtedly have a fundamental liberty interest in the care, custody, and control of their children, the question whether a parent may release a minor's future tort claims implicates wider public policy concerns and the parens patriae duty to protect the best interests of children." Id. at 339 (internal quotation marks and citations omitted); see also Kirton, 997 So.2d at 353 (parent's liberty interest is not absolute and the state as parens patriae may usurp parental control).

In accordance with the parens patriae considerations, many majority-view states reference state statutes that prohibit parents from releasing a child's post-injury cause of action without court approval. Those courts reason that such policies apply with equal force to the prospective, pre-injury context. See Hojnowski, 187 N.J. at 333-34 (noting that "children deserve as much protection from the improvident compromise of their rights before an injury occurs" as they do after the injury); Hawkins v. Peart, 37 P.3d 1062, 1066 (Utah 2001) (because there is "little reason to base the validity of a parent's contractual release of a minor's claim on the timing of an injury," "a parent does not have the authority to release a child's claims before an injury") (emphasis in original).

Several majority-view courts have also noted that such exculpatory agreements misalign incentives to exercise due care and misplace the burden of avoiding or eliminating hazards.

These courts reason that prospective exculpatory clauses may remove an important incentive to act with reasonable care or encourage a lack of care.  Hawkins, 37 P.3d at 1066; see also Hojnowski, 187 N.J. at 333 (for this reason, "[e]xculpatory agreements have long been disfavored" in New Jersey).  Commercial businesses are in a better position to eliminate hazards on their property and to insure themselves against any risks which may not be eliminated, particularly where the patrons are minor children.  See Hojnowski, 187 N.J. at 335, 336 (noting that the "risk of loss should fall on the party best suited to avert injury").

After reviewing the pertinent case law, the Court is persuaded that the New Hampshire Supreme Court would find the Minor Release Agreement, to the extent it purports to bar Dylan's claims here, to be contrary to public policy.  New Hampshire has demonstrated a parens patriae interest in the welfare of children within its jurisdiction.  See In re Nelson, 149 N.H. 545, 548 (2003) (the State, as parens patriae, "may intervene in the family milieu if a child's welfare is at stake").  Indeed, although New Hampshire is cognizant of parents' liberty interest in child-rearing, it has found that those rights "are not absolute, but are subordinate to the State's parens patriae power, and must yield to the welfare of the child."  Id.  This is especially true here, where a parent's execution of a liability release on behalf of minor child does not implicate a parent's more fundamental rights to the care, custody, and control of his/her child.

As with many majority-view states, New Hampshire precludes parents in the post-injury context from settling or releasing a minor child's claim without court approval.  N.H. Rev. Stat. § 464-A:42 ("Settlements, judgments, or decrees of any suit or claim brought on behalf of a minor by a parent or next friend shall be approved by the superior or district court . . .").  The Court finds the reasoning of majority view states to be persuasive on this point and finds that there is little basis to conclude that minors require any less protection in the pre-injury context.

Finally, as described above, New Hampshire looks with disfavor on exculpatory clauses.

For all these reasons, this Court finds that the Minor Release Agreement is not enforceable against Dylan's claims. Accordingly, the Court denies Dragway's motion for summary judgment based on that agreement.

V.  ORDER

For the foregoing reasons, the Court orders as follows:

1. Dragway's motion for summary judgment (Docket No. 21) is denied; and

2. The parties' motions to strike (Docket Nos. 42, 45) are granted.

      /s/  Jennifer C. Boal
    JENNIFER C. BOAL
    UNITED STATES MAGISTRATE JUDGE